## THE FLORIDA.

## DET FORENEDE DAMPSKIB SELSKAB v. JOHNSON et al.

### No. 3304.

Circuit Court of Appeals, Fourth Circuit. Aug. 1, 1932.

Ray Rood Allen, of New York City (Burlingham, Veeder, Fearey, Clark & Hupper, of New York City, and Lord & Whip, of Baltimore, Md., on the brief), for appellant.

Francis S. Laws, of Philadelphia, Pa. (Lewis, Adler & Laws, of Philadelphia, Pa., and John H. Skeen, of Baltimore, Md., on the brief), for appellees.

Before PARKER and SOPER, Circuit Judges, and WATKINS, District Judge.

SOPER, Circuit Judge.

A libel in rem was filed by Johnson & Gallager against the Danish S. S. Florida to secure payment for damages to a cargo of 47,250 bags of cement shipped from Aalborg, Denmark, to Philadelphia, under a charter party between the libelants and the owner and claimant of the ship. The libelants charged that the cement had been placed on board in good condition, and that the ship had then proceeded to Oslo, Norway, where she took on a cargo of wet wood pulp which was negligently stowed upon and around the cement, without suitable separation or protection, so that water from the wood pulp penetrated the cement and caused it to be moisture set, and to harden into lumps. The cement was discharged between September 22 and September 26, 1927, and stored in a closed municipal pier in Philadelphia. After a portion had been unloaded, some damage was observed, and on September 24, 1927, the agents of the steamship were notified, and it was suggested that the damage was probably caused by the wet wood pulp on the ship.

But all liability was disclaimed on the ground that the ship was not a common carrier, and was exempt from liability for bad stowage under certain clauses in the charter party and bill of lading.

When the question of liability came on for trial before the District Judge, it was conceded by the claimant that the Florida was a common carrier as to the libelants' cement, and the controversy was limited to the question whether the goods had been in fact damaged by negligent stowage. The testimony of libelants tended to show that, when the cement was being discharged, a substantial quantity was found to contain hard lumps, and competent experts were of the opinion that the damage was caused by moisture absorbed from the wood pulp shown to have been carelessly stowed nearby. The claimant offered evidence tending to show that, at the time of discharge, there was only a slight hardening of the material; that subsequently it had become air set by exposure to the moisture in the atmosphere during the period of storage for more than six months on the pier; but, even then, the condition was not injurious, and the fine lumps it contained could readily be pulverized by the fingers. The District Judge found, in accordance with the strong preponderance of the proof, that the stowage of the wet wood pulp near the cement was improper, and had brought about the substantial damage found to exist; and that the storage of the goods on the pier did not contribute to this result. Accordingly, it was decreed that the libelants recover their damages and costs, and the case was committed to the late John B. Deming, Esquire, an accomplished lawyer with extensive experience in admiralty matters, to ascertain the amount of the damages and report to the court.

The commissioner reached the conclusion that the libelants were entitled to damages in the sum of $12,414.69, with interest from October 1, 1928, when the loss of the cargo was disposed of; and this sum was made up of three items: (1) The cost of reconditioning the damaged cement; (2) The cost of storing the cement during the period of reconditioning and sale, deducting therefrom the cost of storage for three months, the estimated time for the sale of goods in good condition; and (3) the loss in market value of the damaged material. These findings were confirmed by the District Judge.

The claimant objects to this method of computing the damages, contending that the cement was not damaged on the ship, but deteriorated during the storage on the pier

in the winter of 1927–1928; and reference is made to additional evidence taken before the commissioner of tests of the quality of the cement soon after its arrival by representatives of the city of Philadelphia which tended to prove its good condition at that time. It is also contended that the failure to sell the goods promptly, necessitating storage for a long time on the pier, was due solely to unfavorable market conditions, and that, in any event, the damages allowed were excessive since they included storage charges for eight months and the cost of reconditioning the whole cargo, although only a part was claimed to be damaged. These contentions are discussed in the following extracts from the report of the commissioner, whose comments, in our opinion, are fully justified. The evidence shows that it would not have been practicable to measure the damages by ascertaining the difference in market value of uninjured goods and the goods as actually delivered in a damaged condition. The commissioner said:

"Cement has a notorious affinity for water. One of claimant's witnesses expressly characterized the chemical combination as an 'hydrolysis,' and indicated a diminishing scale of hydrolization; from a rapid 'setting' following mixture with water, to the gradual hydrolysis which may take place after the substance has been exposed to humid air for a long time. But it was the relatively rapid and complete hydrolysis, or 'water set,' which Judge Coleman found that portions of the cement from the Florida underwent, owing to its contact with the wet wood pulp stowed nearby, from which it absorbed a high percentage of moisture.

"It will be apparent, I think, that I cannot ascertain, and that there is no practical necessity for me to ascertain, the extent, by percentage or otherwise, of the damage through hydrolization, of this cement. Nor should the reasonable processes of justice impose upon libelants, especially in the face of claimant's denial of all liability, the burden and expense of separating the damaged and undamaged contents of each of 47,250 bags, worth only about fifty cents apiece; and of making an abstract return, by weight or percentage, of the quantity actually lost. If they had done so I should have expected an emphatic protest of the expense. My reading of the testimony, and the exercise of common sense, satisfying me that the course which libelants followed in the difficult circumstances was the only practicable one. They first tried to sell the cement as it came out of the Florida, but they were unable to do so, although there was a market, and the cement was of good quality. In order to make any reasonable disposition of the cargo they were compelled to overhaul and recondition it. The process of reconditioning was both a survey and a salvage operation, and the result showed, I think, in a fair and practical way, the loss in value, sustained as the proximate consequences of the faulty stowage which the court found, and responsibility for which the court placed upon claimant. That loss in value is what I am required to certify for the court.

"In view of the importance which claimant evidently attaches to the favorable results of various 'tests' from 'samples' made after the cargo was discharged, as showing its then 'sound' condition; I may say that I do not believe any sampling or testing which was done, showed, or was intended to show, what, for want of a better expression, I may call the 'physical condition' of the cargo as a whole; by which I mean the presence or absence of completely hard and unusable bags, or bags whose contents were partly hardened. It seems to me that these sample tests, though conducted conformably with the specifications of the American Society for Testing Materials, could not take the place of a physical survey. They were, I think, more particularly designed to establish the substance in respect of its chemical properties, tensile-strength, time of setting, fineness, etc., which were its fixed characteristics. But it is indisputable, even after such a test, that a purchaser of a portion of the cargo who found it wholly or partly hard, and therefore void of its essential utility as 'cement' would unhesitatingly and justifiably throw it back upon the seller. It was the general physical condition of this cargo that prevented its sale; and whether prospective purchasers were driven off by suspicion, or by actual inspection, seems unimportant. The cargo as a whole was in a condition of unmerchantability, and for the existence of that condition claimant is responsible.

"It will be proper for me to observe, also, considering claimant's criticism of the storage charges which libelants incurred, that I do not feel obliged to decide whether, under normal circumstances, libelants might have disposed of a sound cargo of these proportions within one, two, or three months. They were driven by conditions not of their making, to do the best they could. Nobody knows how long it might have taken them to dispose of their cargo under other conditions, and I

58

do not feel called upon to speculate about that. It seems to me that libellants' conduct in the circumstances was, on the whole, reasonable and proper; and I am not inclined to indulge in hair-splitting to assess their damages.

■ "The cargo, as I have said, originally consisted of 47,250 bags. Of this quantity 10 bags were used as samples; 202 were found completely hard and worthless; 533 were lost in the process of reconditioning, by dissipation as dust, etc.; and the remaining 46,505 bags were sold. In September, 1927, the market price of sound foreign cement at Philadelphia was $2.05 per barrel of 4 bags. The 46,505 bags which were sold brought an average price of $1.87 per barrel. Thus, .after reconditioning, a loss to libelants of $.18 per barrel appears, and this loss they are entitled to recover with interest.

■ "The other element of libelant's claim is the expense involved in reconditioning the cargo. This amounts to about $10,000, and it appears, at first glance, over large for salvaging a cargo having an approximate sound value of only $25,000. But I consider the outlay unavoidable, and by incurring it libelants saved about fifty per cent of the value which otherwise might have been lost. By cooperation some other method of ascertaining libelants' losses might possibly have been devised; perhaps at less expense. But claimant has stood upon its contention of non-liability from the beginning, and has made no constructive suggestions, so far as I can discover. Under the circumstances I think it has no right to complain of what was done. Libelants have discharged the burden of proof and their duty to ameliorate the damage as fairly and reasonably as the circumstances permitted. They are entitled to be made whole."

The decree of the District Court is affirmed.